# In the
# United States Court of Appeals
## For the Seventh Circuit

————————

No. 07-2311

VILLAGE OF DEPUE, ILLINOIS, a
Municipal Corporation,

*Plaintiff-Appellant*,

*v.*

EXXON MOBIL CORPORATION, also known
as MOBIL CHEMICAL CORPORATION, and
VIACOM INTERNATIONAL, INCORPORATED,

*Defendants-Appellees*.

————————

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 C 1266—**Joe Billy McDade,** *Judge.*

————————

ARGUED FEBRUARY 14, 2008—DECIDED AUGUST 11, 2008

————————

Before RIPPLE, SYKES and TINDER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* The Village of DePue ("the Village") brought this action in Illinois state court against Exxon Mobile Corp., Viacom International, Inc. and CBS Broadcasting, Inc. (collectively, "Exxon"). Exxon removed

the case to the district court under 28 U.S.C. § 1441. The district court determined that it had diversity jurisdiction[1] and, upon Exxon's motion, dismissed the Village's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Village timely appealed the matter to this court.[2] For the reasons stated in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" or "the Superfund"), 42 U.S.C. § 9601 et seq., was enacted in 1980. It charges the Environmental Protection Agency ("EPA") with monitoring and, in some instances, conducting cleanups on sites that have sustained environmental damage as a result of hazardous materials. CERCLA authorizes the government to identify parties that are potentially responsible for the damage and to require them to clean up the site. *Id.* § 9606. It is often referred to as the Superfund because it also established a large trust fund to advance environmental cleanup goals, including financing governmental response activities at sites where no potentially responsible party can be identified

---

[1]  We shall discuss the district court's jurisdiction to hear this case in the course of this opinion.

[2]  We have subject matter jurisdiction under 28 U.S.C. § 1291.

to finance the cleanup. *Id.* § 9611(a). CERCLA authorizes the federal government to conduct cleanup activities, but it also permits the federal government to enter into cooperative agreements with state agencies that then conduct the cleanups using Superfund money. *Id.* § 9604.

CERCLA is connected to the National Priorities List ("NPL") and the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. § 300.1 et seq. CERCLA requires the EPA to maintain the NPL, which is intended primarily to guide the EPA in determining which sites warrant further investigation. A site's cleanup may not be financed by Superfund monies unless the site is on the NPL. Placement on the list does not mean, however, that any remedial or removal action must be taken by the government. The NCP is a regulation that was promulgated by the EPA in 1982 in order to implement CERCLA. The NCP sets guidelines and procedures for responding under CERCLA to releases and threatened releases of hazardous substances, pollutants or contaminants. *See* 42 U.S.C. § 9621(f).

The Superfund Amendments and Reauthorization Act ("SARA") was enacted in 1986. SARA was designed to speed up CERCLA's remedial processes at every phase and to make CERCLA more effective. Among other adjustments to CERCLA, SARA included restrictions that, except in limited circumstances, bar judicial review of the EPA's choice of removal or remedial action until after the action has been completed or enforced. *Id.* § 9613(h); 1 Allan J. Topol & Rebecca Snow, Superfund Law and Procedure § 2:54, at 119-22 (updated by

Caroline Broun, 2007). Section 113(h) is the jurisdictional limitation that was added to CERCLA by SARA; it states:

> No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title . . . .

42 U.S.C. § 9613(h). Section 113(h) then lists five additional limitations on this bar to jurisdiction, none of which are at issue in this case. *See id.* § 9613(h)(1)-(5).

## B.

The Illinois Environmental Protection Agency ("IEPA") was created by Illinois statute. 415 ILCS 5/4. Its mandate includes investigating violations of the Illinois Environmental Protection Act ("Illinois Act"), *id.* at 5/1 et seq., and undertaking actions in response to hazardous substances. Additionally, the IEPA is Illinois' implementing agency for federal environmental laws, including CERCLA. *Id.* at 5/4(l). In that capacity, the IEPA is "authorized to take all action necessary or appropriate to secure to the State the benefits of [federal environmental laws]." *Id.* Illinois also has the Illinois Hazardous Substances Pollution Contingency Plan ("ICP"), 35 Ill. Adm. Code Pt. 750.101 et seq. The ICP is a state-law corollary to the NCP that sets

guidelines and procedures for responding to releases and threatened releases of hazardous substances, pollutants or contaminants.

## C.

Inside the Village of DePue, Illinois, is an environmentally hazardous site. From 1903 to 1989, operations on the 1500 acre site generated waste material that severely contaminated the site and some areas around it. The EPA took note of the site in 1980 and, over the next ten years, conducted several preliminary environmental assessments and inspections on the site. The IEPA began investigating the site pursuant to its authority under state law in March 1992. As a result of the IEPA's expanded analysis of the site, the EPA added the site to the NPL in 1999.

In 1995, at the request of the IEPA, the Illinois Attorney General, alleging violations of Illinois law, filed suit against Exxon's corporate predecessors in Bureau County, Illinois.[3] The IEPA's role in the lawsuit was conducted "pursuant to its own authority under the [Illinois] Act, and regulations promulgated thereunder." R.1, Ex. 1 pt.1 at 28. As a result of that suit, the state court entered an interim consent order ("Consent Order") as a "partial settlement of all issues" between the people of Illinois and Exxon. *Id.* at 27.

---

[3] The suit was filed under the Illinois Environmental Protection Act, 415 ILCS 5/22.2 & 42(d), (e).

Under this Consent Order, Exxon must perform a phased investigation of the site and implement certain interim remedies. It also must propose final remedies to the State of Illinois before completing final remedial action for the site. The Consent Order requires Exxon to perform its investigations and remedial actions in compliance with both the ICP and the NCP. The State of Illinois, in consultation with the EPA, has "sole discretion" to decide if the final remedies proposed by Exxon are appropriate. *Id.* pt.2 at 1. The activities completed under the Consent Order are subject to approval by the State of Illinois. *Id.* at 4. The Consent Order binds, among other parties, Exxon, the IEPA and the "People of the State of Illinois." *Id.* at 3.

Under the Consent Order, the "final remedial action" phase has not yet been reached; Exxon still is investigating and performing interim remedial actions. No party disputes that Exxon is fulfilling the requirements of the Consent Order. Exxon has spent more than $30 million to date on investigations and interim remedial actions at the site.[4] In addition, Exxon has begun investigating

---

[4] The interim remedial actions include: designing, building and operating a water treatment plant to remove contaminants from surface and ground water that was formerly discharging into nearby DePue Lake; remediating a contaminated landfill by eliminating or closing the former effluent ponds; installing a vegetative cover over the landfill; building an engineered wetland to treat any effluent from the landfill; cleaning out a drainage channel that connects the site to DePue

(continued...)

contaminants in the soils within the Village, DePue Lake and the surrounding wetland and flood plain areas. As part of this investigation, Exxon has gathered information for ecological and human health risk assessments. After completing all phases of the remedial investigation, Exxon then will conduct feasibility or design studies. Eventually, it will make permanent remedial changes to the site.

In August 2006, while the investigation and remediation process required by the Consent Order was ongoing, the Village posted Notices to Abate Nuisance at the site. These notices sought to impose immediate, site-wide cleanup obligations on Exxon. The notices ordered Exxon to have the materials removed and the site cleaned of all contaminants to the satisfaction of the Village within ten days.[5] If Exxon failed to comply within ten days, the notices required Exxon to pay a nuisance fine of $750 per day until the site cleanup was complete and the site was removed from the NPL.

---

[4] (...continued)
Lake to prevent contaminants from that area from being washed into DePue Lake in the future; conducting an initial health evaluation of any short-term threats to public health; preventing onsite trespass; preventing clean surface water from contacting any contaminants; completing cleanup of the former vanadium catalyst disposal area; and re-vegetating portions of the site.

[5] The notices did not define the terms "materials" or "contaminants" and provided no factual basis for the alleged nuisance.

**D.**

The Village of DePue filed its complaint against Exxon in Illinois state court. The complaint asserted that Exxon had violated and continued to be in violation of the Village's nuisance ordinance. It sought three forms of relief: a judgment declaring that Exxon had violated the ordinance, daily fines of up to $750 for that alleged violation and injunctive relief requiring Exxon immediately to clean the site and have it removed from the NPL.

Exxon removed the case to the district court under 28 U.S.C. § 1441. It asserted jurisdiction based upon diversity of citizenship. The district court determined that all the requirements of diversity jurisdiction had been met.[6] The Village disputed jurisdiction on two grounds. First, it filed a motion for remand on the ground that *Younger* abstention precluded federal adjudication of the case, and second, it contended that the Consent Order had a jurisdiction-selection clause that required the district court to remand the case. The district court held that it was not precluded from hearing the case by *Younger* or by the Consent Order.

Exxon then filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). It con-

---

[6] The Village is a citizen of Illinois. Exxon Mobile Corp. is a New Jersey corporation with its principal place of business in Texas. Viacom International, Inc., now called CBS Operations, is a Delaware corporation with its principal place of business in New York. CBS Broadcasting, Inc. is a New York corporation with its principal place of business in New York.

tended that the causes of action stated in the complaint were preempted by federal and state law. The district court agreed; it concluded that section 113(h) of CERCLA barred the Village's legal challenges. Although noting that CERCLA contains "savings" provisions that preserve remedies under state and local law, the court held that, if such a law conflicts with a CERCLA-mandated remedial action, the bar of section 113(h) applied and deprived the court of jurisdiction until the remedial work was completed. The district court held that the relief sought by the Village conflicted squarely with the detailed process mandated by the Consent Order and concluded that section 113(h) of CERCLA divested it of jurisdiction to hear the claims.

The district court also held that the Village's claims were preempted by Illinois law. It concluded that the claims conflicted with the process required by the IEPA and its implementing regulations because the Village was seeking immediate and undefined completion of the cleanup at the site. Such relief, held the district court, would conflict with the considered and phased process outlined in the ICP and implemented at the site via the Consent Order. Such interference, reasoned the court, was preempted by Illinois law. It therefore granted Exxon's motion to dismiss the Village's claims with prejudice.

## II

## DISCUSSION

We review de novo a district court's dismissal of a complaint for failure to state a claim. *Michalowicz v. Vill. of*

*Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008). In our review, we must accept the allegations in the plaintiff's complaint as true and draw all reasonable inferences in favor of the plaintiff. *Id.*

## A.

### Jurisdiction

We review de novo the question of subject matter jurisdiction. *Alexander v. Mount Sinai Hosp. Med. Ctr.*, 484 F.3d 889, 891 (7th Cir. 2007). Because determining the propriety of removing to the district court an action filed in state court necessarily requires that we determine the authority of the district court to supplant the state court's jurisdiction with its own, *see* 28 U.S.C. § 1441(a), we also review de novo the denial of a motion to remand the case to state court. *Alexander*, 484 F.3d at 891. Such a decision amounts to a decision by the district court that its assertion of jurisdiction over that of the state court was legally permissible.

We also "review de novo a district court's decision to decline to abstain from exercising jurisdiction pursuant to the *Younger* abstention doctrine." *FreeEats.com, Inc. v. Indiana*, 502 F.3d 590, 595 (7th Cir. 2007).

### 1. Forum Selection Clause

We begin by noting that the district court properly concluded that it possessed diversity jurisdiction over the case. The parties concede, and we agree, that there is

complete diversity of citizenship and that the amount in controversy requirement is met in this case. *See* 28 U.S.C. § 1332.

The Village contends, however, that the district court erred in refusing to remand the case; in its view, a forum selection clause in the Consent Order reserved jurisdiction in the Circuit Court of Bureau County, Illinois. Even assuming that the Village is in a position to enforce the terms of the Consent Order between Exxon and Illinois—a proposition for which the Village has failed to offer any persuasive support—the Village has failed to demonstrate that the Consent Order contains a reservation of jurisdiction. The Village points only to a provision in the Consent Order stating that "*the venue of any action commenced in [Illinois] Circuit Court* for the purposes of interpretation, implementation and enforcement of the terms and conditions of this Interim Consent Order as provided herein shall be in Bureau County, Illinois." R.1, Ex. 1 pt.1 at 28. The Village contends, without support, that this provision is a jurisdiction selection clause. We cannot agree. On its face, the provision in question does not purport to vest jurisdiction in any court. Instead, it states which *venue* among the various Illinois counties would be appropriate in the event that an action was commenced in an Illinois Circuit Court "for the purposes of interpretation, implementation and enforcement of the terms and conditions" of the Consent Order. *Id.* The Village offers no support for its contention that the provision is a jurisdiction selection clause and the plain text of the Consent Order reads to the contrary. The district court properly found that the Village was not entitled,

on the basis of this provision in the Consent Order, to have its case remanded to the state court.

## 2. *Younger* Abstention

The Village next contends that the case should have been remanded to the state court because the district court was required by *Younger v. Harris*, 401 U.S. 37 (1971), to abstain from hearing the case. As a general rule, *Younger* abstention "requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *FreeEats.com*, 502 F.3d at 595. The rule in *Younger* "is designed to permit state courts to try state cases free from interference by the federal courts." *Id.* Although originally applied to prevent interference only with criminal proceedings, today *Younger* applies to some civil as well as criminal proceedings. *See, e.g.*, *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 595, 612 (1975) (applying *Younger* abstention to prevent interference with a quasi-criminal state nuisance suit). The rule in *Younger* protects the principles of "equity, comity, and federalism," which "have little force in the absence of a pending state proceeding." *Id.* at 602-03 (quotation omitted). It also is concerned with preventing "duplicative legal proceedings," "disruption of the state criminal justice system" and the negative implication that state courts are unable "to enforce constitutional principles." *Id.* at 604, 608.

The Village contends that removing an action from state court creates a pending state proceeding with which

the removed action, then in federal court, conflicts. We cannot accept this argument. It is well established that *Younger's* concepts of comity and "Our Federalism" are inapplicable "when no state proceeding was pending nor any assertion of important state interests made." *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992) ("Absent any pending proceeding in state tribunals, therefore, application by the lower courts of *Younger* abstention was clearly erroneous."). The mere fact that a case *could* be heard in state court is insufficient to justify *Younger* abstention. *Cf. id*. Removal under 28 U.S.C. § 1441 simply does not leave behind a pending state proceeding that would permit *Younger* abstention. *See In re Burns & Wilcox, Ltd.*, 54 F.3d 475, 477 (8th Cir. 1995), *limited on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996). *Cf. Kirkbride v. Cont'l Cas. Co.*, 933 F.2d 729, 734 (9th Cir. 1991) (refusing to abstain on the basis of the *Colorado River* abstention doctrine from hearing a diversity suit merely because it had been removed from state court); *Noonan S., Inc. v. County of Volusia*, 841 F.2d 380, 382 (11th Cir. 1988) (same).

The Village's reliance on *Huffman* to support this argument is misplaced. *Huffman* does *not* stand for the premise that *Younger* abstention requires a district court to decline to hear a case merely because the case had been removed from state court. In *Huffman*, instead of appealing a state court's adverse decision, the plaintiff instituted a *separate* federal proceeding in which he attempted to enjoin the state court from carrying out its enforcement of its nuisance judgment. Had the federal court enjoined the ongoing state proceeding, that injunction would have been a

great interference and an affront to comity and federalism. *Huffman*, 420 U.S. at 607. Here, by contrast, the Village has failed to point to any ongoing state proceeding with which the removed federal case conflicts.

Neither is the Consent Order entered by a state court in an earlier proceeding the sort of pending state proceeding with which the district court's exercise of jurisdiction could be said to implicate the constraints of the *Younger* doctrine. In the present action, the district court was not asked to conduct a proceeding that would interfere with the state proceeding that resulted in the consent decree. Nor was it asked to enjoin a proceeding pending in state court. The district court therefore properly refused to apply *Younger* abstention principles.

### 3. Divestiture of Jurisdiction by CERCLA Section 113(h)

We next address the effect of CERCLA section 113(h). The district court concluded that "the Village's claim [was] preempted by CERCLA Section 113(h) and as a result . . . [that the court] lack[ed] jurisdiction over the Village's claim." *Vill. of Depue, Ill. v. Exxon Mobile Corp.*, 2007 WL 1438581, at *9 (C.D. Ill. May 15, 2007). We review de novo questions of statutory interpretation. *Olson v. Risk Mgmt. Alternatives, Inc.*, 366 F.3d 509, 511 (7th Cir. 2004).

Section 113(h), titled "Timing of review," states:

> No Federal court shall have jurisdiction under Federal law *other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction)* or under State law which is applicable or relevant and appropriate under

section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title . . . .

42 U.S.C. § 9613(h) (emphasis added). The provision then lists five additional exceptions to the divestiture of jurisdiction, none of which are at issue in this case. *See id.*

Here, the sole question is whether the district court, which had jurisdiction "under section 1332 of Title 28," nevertheless was divested of jurisdiction by section 113(h). *Id.* Section 113(h) is a "blunt withdrawal of federal jurisdiction," *Pollack v. U.S. Dep't of Defense*, 507 F.3d 522, 525 (7th Cir. 2007) (quotation omitted), but it is expressly limited by its own terms: It does not apply to federal courts sitting in diversity. 42 U.S.C. § 9613(h). Thus, section 113(h) permits a federal court to hear a challenge to a federal cleanup initiated under CERCLA if the challenge arises as, for instance, a state-law nuisance action. *Pollack*, 507 F.3d at 525. Section 113(h) is limited additionally in that, under the express terms of the statute, it applies only to bar jurisdiction over challenges to certain cleanups authorized under CERCLA, specifically to challenges to those "remedial action[s] selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title." 42 U.S.C. § 9613(h). In effect, section 113(h) applies only when the EPA has selected a remedial action under section 9604 or issued an order under section 9606(a), and only then if the challenge arises under federal law. In that limited circumstance, section 113(h) removes jurisdiction over challenges to the EPA's chosen remedial effort until

after the cleanup has been completed. *Pollack*, 507 F.3d at 525.

This interpretation is consistent with the statutory purpose of section 113(h), enacted as part of SARA to ensure that, once the EPA chooses a removal or remedial action for a particular site, litigation will not delay the completion or enforcement of a cleanup action.[7] In effect, section 113(h) prevents federal-law challenges to the EPA's selected remedy from going forward until after the remedy has been completed. *Id.* at 525.

The legislative history of SARA also lends support to this holding. The Conference Report for SARA states that the "[n]ew section 113(h) is not intended to affect in any way the rights of persons to bring nuisance actions under State law." H.R. Rep. No. 99-962, at 224 (1986) (Conf. Rep.). Similarly, the Congressional Record of Senate Proceedings indicates that unadopted bill language would have extinguished all federal review, but the language that was adopted permitted expressly diversity jurisdiction. 132 Cong. Rec. S17212-03 (daily ed. Oct. 17, 1986) (statement of Sen. Mitchell), 132 Cong. Rec. S17136-01 (daily ed. Oct. 17, 1986) (statement of Sen. Stafford). The two Senators who discussed the provision with regard to diversity jurisdiction both stated specifically that section 113(h) did not preempt nuisance cases that arose under state law and that

---

[7] *See* 1 Allan J. Topol & Rebecca Snow, Superfund Law and Procedure § 2:54, at 119-22 (updated by Caroline Broun, 2007); *see also Pollack*, 507 F.3d at 524-25.

federal courts were permitted to hear state-law nuisance actions if those cases arose in diversity.[8]

---

[8] Senator Mitchell said: "The conference language would permit a suit to lie in either Federal court where jurisdiction could be based on diversity of citizenship—or in State court, where based on nuisance law. This construction is confirmed by the statement of the managers that 'New section 113(h) is not intended to affect in any way the rights of persons to bring nuisance actions under State law with respect to releases or threatened releases of hazardous substances, pollutants or contaminants.'" 132 Cong. Rec. S17212-03 (daily ed. Oct. 17, 1986) (statement of Sen. Mitchell). Senator Mitchell also stated that

> [w]hether or not a challenge to a cleanup will lie under nuisance law is determined by that body of law, not section 113. New subsection (h) governs only the suits filed under the circumstances enumerated in paragraphs (1) through (5) for the review of "challenges to removal or remedial action selected under section 104, or to review any order issued under 106(a)". There is no support whatsoever . . . for the proposition that "any controversy over a response action selected by the President, whether it arises under Federal law or State law, may be heard only in Federal court and only under circumstances provided" in section 113. That statement is contrary to the express legislative language and the statement of managers.

*Id.*

Senator Stafford also commented on section 113(h) and the diversity jurisdiction provision. 132 Cong. Rec. S17136-01 (daily ed. Oct. 17, 1986) (statement of Sen. Stafford). He elaborated on

(continued...)

[8] (...continued)
the Conference Report language quoted above, stating that "[n]ew section 113(h) is not intended to affect in any way the rights of persons to bring nuisance actions under State law with respect to releases or threatened releases of hazardous substances, pollutants, or contaminants." *Id.* He also commented that the language in section 113(h) deliberately had been changed to permit federal review of

> challenges based on State laws, such as nuisance. . . . Clearly, . . . a complaint based on State nuisance law would fall within the phrase "no court shall have jurisdiction to review any challenge". But equally clearly, such a claim would not be barred by the conference language, which would permit a suit to lie in either Federal court (where jurisdiction could be based on diversity of citizenship) or in State court. This construction is confirmed by the statement of managers explanation that—

>> New section 113(h) is not intended to affect in any way the rights of persons to bring nuisance actions under State law with respect to releases or threatened releases of hazardous substances, pollutants or contaminants.

*Id.*

Senator Stafford also commented on the limits of section 113(h). He said:

> Whether or not a challenge to a cleanup will lie under [n]uisance law is determined by that body of law, not section 113, because section 113 of CERCLA governs only claims arising under the act. . . . Similarly, new subsection (h) governs only the suits filed under the circumstances

(continued...)

The plain language of section 113(h) states that the bar to jurisdiction does not apply to a federal court sitting in diversity. This holding is supported by the plain language, purpose and statutory history of the statute. Here, where the district court sat in diversity, it was not divested of jurisdiction by section 113(h).

## B.

### Preemption by CERCLA

Federal preemption is an affirmative defense upon which the defendants bear the burden of proof, and we review de novo a district court's determination that federal law preempts a state law or municipal ordinance. *See Fifth Third Bank v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005).

Although the district court seems to have concluded that it was divested of jurisdiction by section 113(h), its opinion might be read as holding that, more generally, CERCLA preempted the Village's claims. Even if we were to assume that Exxon so contends, it has not met its burden of proving that CERCLA preempted the Village's claims.

---

[8] (...continued)
  enumerated in paragraphs (1) through (5) for the review of "challenges to removal or remedial action selected under section 104, or to review any order issued under 106(a)."

*Id.* He also stated that "[n]othing in this act shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." *Id.*

CERCLA's preemptive scope is not total. The statutory text states expressly, in several provisions, that at least some claims under state law are permitted to proceed. Section 114(a) states that "[n]othing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such States." 42 U.S.C. § 9614(a). Section 302(d) states that "[n]othing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to release of hazardous substances or other pollutants or contaminants . . . ." *Id.* § 9652(d). CERCLA contemplates "action[s] brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility." *Id.* § 9658(a)(1). Section 310(h) states that "[t]his chapter does not affect or otherwise impair the rights of any person under Federal, State, or common law, except with respect to the timing of review as provided in section 113(h) of this title or as otherwise provided in section 9658 of this title (relating to actions under State law)." *Id.* § 9659(h). Finally, section 113(h) itself applies to bar jurisdiction only over federal-law challenges "to removal or remedial action selected under section 9604" or "any order issued under section 9606(a)." *Id.* § 9613(h).

The precise contours of CERCLA preemption over state environmental cleanup actions or municipal ordinances that affect federal removal or remedial actions are not easy

to discern.[9] We need not address this area in any compre-
hensive way, however, because Exxon has not met its
burden of showing that there is *any* federal law or effort
with which the Village's nuisance ordinance could conflict.

Exxon's sole argument is that section 113(h) bars the
Village's claims because those claims challenge a CERCLA
remedy—the Consent Order previously entered by the
state court. The Consent Order was instituted by the *Illinois*
EPA, however, not by the federal government, and the
IEPA's role in the lawsuit and Consent Order was con-
ducted "pursuant to its own authority under the [Illinois
Act]." R.1, Ex. 1 pt.1 at 28. Exxon has failed to point to "any
challenge[] to removal or remedial action selected under
section 9604 of this title," or to "any order issued under
section 9606(a)." *See* 42 U.S.C. § 9613(h). In fact, Exxon has
failed to show that any CERCLA-authorized remediation

---

[9] *See, e.g.*, *Fireman's Fund Ins. Co. v. City of Lodi, Cal.*, 302 F.3d
928, 943 (9th Cir. 2002) (holding that a city ordinance is pre-
empted by CERCLA if it "interfere[s] with the accomplishment
and execution of CERCLA's full purpose and objectives" (second
alteration omitted)); *United States v. City & County of Denver*, 100
F.3d 1509 (10th Cir. 1996) (holding that CERCLA preempted a
local zoning ordinance that was in actual conflict with a reme-
dial order of the EPA); 1 Allan J. Topol & Rebecca Snow,
Superfund Law and Procedure § 2:20, at 59 (updated by Caroline
Broun, 2007) (noting that some courts have held that, even
when the federal government has negotiated a remedy with a
potentially responsible party and it is approved by the court in
the form of a consent decree, the consent decree has no preemp-
tive effect on the enforcement of a tougher state environ-
mental law).

effort or, indeed, any federal involvement whatsoever is implicated in this case with which the application of the Village's nuisance ordinance could conflict. Exxon therefore has failed to carry its burden of proving federal preemption of the Village's claims. *See Fifth Third Bank*, 415 F.3d at 745.

## C.

### Preemption by State Law

In Illinois, municipalities that are not home-rule units have limited powers. *Hawthorne v. Vill. of Olympia Fields*, 790 N.E.2d 832, 840 (Ill. 2003). The Village, a non-home-rule unit, may exercise only those powers enumerated in the Illinois Constitution or conferred upon it, expressly or impliedly, by state statute. *Id.* Because the Village is a non-home-rule unit, any of its ordinances that "conflict with the spirit and purpose of a state statute are preempted by statute." *Id.* at 842. "Where there is a conflict between a statute and an ordinance, the ordinance must give way." *Id.* (alteration omitted) (quotation omitted).

The parties do not dispute that the Village had the power to adopt the nuisance ordinance that it seeks to apply to Exxon in this case. *See* 65 ILCS 5/11-60-2 ("The corporate authorities of each municipality may define, prevent, and abate nuisances."); *Vill. of Sugar Grove v. Rich*, 808 N.E.2d 525, 531 (Ill. App. Ct. 2004) ("Historically, nuisance ordinances have been held to be invalid only when the municipality's determination of what constitutes a nuisance is clearly erroneous."). The dispute here is whether the Village's nuisance ordinance, as applied, exceeds its

authority and is impermissible in light of the spirit of the laws and policies of Illinois. *See id.*; *Hawthorne*, 790 N.E.2d at 841.

The Supreme Court of Illinois has long held that, as a result of the Illinois Act's express purpose of "establish[ing] a unified, state-wide program to protect the environment, the Act was intended to preempt non-home-rule regulations." *Vill. of Carpentersville v. Pollution Control Bd.*, 553 N.E.2d 362, 364 (Ill. 1990) (alteration in original) (internal quotation marks omitted) (internal citation omitted). Because the Village is a non-home-rule unit, its ordinances may not "conflict with the spirit and purpose of a state statute." *Hawthorne*, 790 N.E.2d at 842. The Illinois Act was enacted in part because of the Illinois General Assembly's findings that, "because environmental damage does not respect political boundaries, it is necessary to establish a unified state-wide program for environmental protection," and that "environmental problems are closely interrelated and must be dealt with as a unified whole in order to safeguard the environment." 415 ILCS 5/2(a)(ii), (iii). The purpose of the Illinois Act is "to establish a unified, state-wide program supplemented by private remedies, to restore, protect and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them." *Id.* at 5/2(b). The Illinois Act authorizes the Illinois Attorney General to "institute a civil action for an injunction, prohibitory or mandatory, to restrain violations of this Act, . . . or to require such other actions as may be necessary to address violations of this Act . . . ." *Id.* at 5/42(e).

Here, the Illinois Attorney General instituted a civil action against Exxon in order to address violations of the Illinois Act. *See id.* The result of that action was the Consent Order, which details a phased and considered plan for cleaning up the environmental hazard at the site that is located in and near the Village. The Village's application of its nuisance ordinance seeks to address, in a heavy-handed manner, a difficult environmental problem that certainly is not only of local concern. *See City of Des Plaines v. Chicago & N.W.R.R. Co.*, 357 N.E.2d 433, 436 (Ill. 1976). If the Village were permitted to apply its nuisance ordinance to force Exxon to complete *immediately* the cleanup of the site, on penalty of $750 per day for noncompliance, then it could prevent compliance with the measured cleanup process adopted by Illinois through the Consent Order under the authority of Illinois law. *Compare Hawthorne*, 790 N.E.2d at 843. Such a result would frustrate the purpose of the Illinois Act, which permits the Illinois Attorney General to enter consent orders precisely like this one for the purpose of removing and remediating environmental hazards. *See id.*

The Village's reliance on *Carpentersville* is without merit. *Carpentersville* held that a village could impose zoning requirements that directly conflict with Illinois' uniform program of environmental regulation *if* the Illinois Act contained a specific provision permitting the local regulation of the issue in question. 553 N.E.2d at 367. There, a village's zoning ordinance limited smokestacks to 30 feet in height, and the IEPA had issued a permit to a company conditioned on the company raising its discharge smokestack to 100 feet. *Id.* at 363. Although the facility could not

comply with the requirements in its permit and with the local zoning ordinance, the Illinois Act contains a provision that conditioned the permit on compliance with local zoning regulations. *Id.* ("[T]he granting of a permit under this Act shall not relieve the applicant from meeting and securing all necessary zoning approvals from the unit of government having zoning jurisdiction over the proposed facility." (quotation omitted)).

In *Carpentersville*, the local zoning regulation did not conflict with the state-issued permit because the statute expressly conditioned the permit upon the facility's compliance with that very zoning regulation. *Id.* at 367. In the present case, however, neither the Consent Order, entered under the Illinois Act, nor the Illinois Act itself contains language permitting a direct conflict between the IEPA's Consent Order with Exxon and the Village's application of its nuisance ordinance. Here, Exxon is *required* to perform its work in compliance with the Illinois Act, as directed by the Consent Order; the Village simply is seeking to force it to act in a manner inconsistent with those state requirements.

The Illinois legislature enacted the Illinois Act in order to safeguard the environment and to restore contaminated areas through a phased and carefully considered process. Ignoring this process by conducting and concluding a cleanup to the satisfaction of the Village is not a plan in service to the goals of the Illinois Act. The Village's application of its nuisance ordinance in this case is overreaching because it attempts to regulate an environmental hazard that is not local in nature and that already is subject to a cleanup under the authorization and direction of the

state. Accordingly, we hold that the Village's claims are preempted by the Illinois Act.

## Conclusion

For the forgoing reasons, we affirm the district court's Rule 12(b)(6) dismissal on the ground that the Village's claims are preempted by Illinois law.

AFFIRMED